# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| STILWELL VALUE PARTNERS I, L.P. | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-4432 |
| | : | |
| PRUDENTIAL MUTUAL HOLDING CO., et al., | : | |
| Defendants. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                    August ___, 2007

Plaintiff Stilwell Value Partners I, L.P. ("SVP") brings this action in diversity against

Prudential Bancorp, Inc. of Pennsylvania ("Prudential"), Prudential Mutual Holding Company

("MHC"), the four individuals who serve on both MHC's and Prudential's Boards of Directors,

and the two individuals who serve on Prudential's Board of Directors only[1] (collectively,

"defendants") based on defendants' anticipated actions that plaintiff contends are contrary to

certain representations defendants made in an offering prospectus.  Presently before the court is a

motion filed by defendants to dismiss plaintiff's complaint for failure to state a claim, pursuant to

Federal Rule of Civil Procedure 12(b)(6).  For the reasons described herein, the motion will be

granted in part and denied in part.

## I. Background

---

[1]The director defendants are as follows:  Thomas A. Vento serves as President and Chief Executive Officer of Prudential, and is a director of both MHC and Prudential; Jerome R. Balka, John P. Judge and Joseph W. Packer are directors of both MHC and Prudential; A.J. Fanelli and Francis V. Mulcahy are directors of Prudential (collectively, "director defendants").   (Compl. ¶¶ 11-16.)

1

### A. Plaintiff's Factual Allegations[2]

Prudential and MHC are Pennsylvania corporations that were created after the reorganization of Prudential Savings Bank from a mutual savings bank to a mutual holding company structure.  (Compl. ¶ 10; Ex. A of Def.'s Mot. ("Prospectus") 1.)[3]  The reorganization resulted in a three-tiered organizational structure, whereby Prudential, a publicly-traded Pennsylvania corporation, became the sole owner of Prudential Savings Bank.  (Compl. ¶ 10; Prospectus 1-2.)  Prudential, in turn, is 55% owned by MHC, a mutual holding company that has no authorized capital stock and no shareholders, and is controlled by its directors who elect themselves and their successors.  (Compl. ¶ 10; Prospectus 1.)   The directors of MHC, through MHC's majority stock ownership in Prudential, can determine the outcome of any Prudential shareholder vote in which MHC participates.  (Compl. ¶ 22; *see also* Prospectus 105.)  The remaining 45% minority interest in Prudential was sold to the public in an initial public offering ("IPO").  (Compl. ¶ 22.)

In connection with the IPO, Prudential filed with the Securities and Exchange Commission ("SEC") a final prospectus dated January 27, 2005 that disclosed the reorganization plan.  (*Id*. ¶¶ 23-24; Prospectus.)  The prospectus explained that one of the reasons for undertaking the reorganization was to enable Prudential "to provide stock-based incentives to

---

[2]The factual account accepts all allegations in the complaint as true.  *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

[3]  Although, in general, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings, the prospectus attached to defendants' motion as Exhibit A may be considered as an exception to the general rule because it is "a document integral to or explicitly relied upon in the complaint."  *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted).

[its] officers, employees and directors."  (Prospectus 3; *see also* Compl. ¶ 25.)  Specifically, the prospectus detailed the plans that are at issue:  a "stock option plan" and "stock recognition and retention plan" ("the stock plans"), which would be established to benefit Prudential's employees and directors.  (Compl. ¶ 9; *see also* Prospectus 9.)  As intended, the stock plans would have the potential to benefit the director defendants.  (Compl. ¶ 9; *see also* Prospectus 14.)

  The prospectus stated that implementation of the stock plans would require shareholder approval and would be submitted for approval no earlier than six months after completion of the reorganization.  (Compl. ¶ 28; Prospectus 14, 17, 28, 87-88.)  According to plaintiff, the prospectus promised that this vote on the stock plans would be submitted only to Prudential's minority shareholders and MHC would be excluded from voting.  (Compl. ¶ 29.)  Plaintiff reads this promise from the repeated language of the prospectus stating that approval of the stock plans was uncertain.  (*Id.* ¶¶ 28-32.)  The following statements are contained in the prospectus:

- The stock recognition and retention plan and stock option plan will be implemented if we receive shareholder approval of the plans. . . . Such shareholder approval cannot be obtained earlier than six months after the reorganization.  If the stock recognition and retention and stock option plans are approved by our shareholders, we intend to grant stock awards and options to our employees and directors.  (Prospectus 10.)

- We also intend to submit a stock recognition and retention plan to our shareholders for approval no earlier than six months after completion of the reorganization.  Our officers, employees and directors could be awarded, at no cost to them, under the stock recognition and retention plan up to an aggregate of 4.00% of the offering.  (*Id.* at 14.)

- If the reorganization plan is completed and shareholders subsequently approve a stock recognition plan and stock option plan, we will allocate stock to our officers, employees and directors through these plans.  (*Id.* at 17.)

- If the restricted stock plan is approved by our shareholders, the plan intends to acquire an amount of common stock equal to 4.00% of the shares of common

stock sold in the offering . . . ."  (*Id.* at 26.)

- There can be no assurance that shareholder approval of the stock option plan will be obtained, that the exercise price of the options will be $10.00 per share or that the Black-Scholes option pricing model assumptions used to prepare the table will be the same at the time the options are granted.  (*Id.* at 28.)

- If approved by shareholders, the stock recognition and retention plan, intends to acquire an amount of common stock equal to 4.00% of the shares of common stock sold in the offering . . . The table assumes that shareholder approval has been obtained . . . There can be no assurance that shareholder approval of the stock recognition and retention plan will be obtained. (*Id.*)

Plaintiff alleges it understood these statements to mean that MHC would not participate in the voting on the stock plans.  (Compl. ¶ 31.)  Because Prudential's controlling directors—thus MHC's controlling directors—intended to adopt the stock plans, had it been intended that MHC would participate in the shareholder vote, plaintiff alleges it would have been a preordained certainty that the stock plans would be approved.  (*Id.* ¶ 32.)

In the section labeled "Risk Factors," the prospectus also disclosed the following:

[MHC] will own a majority of our common stock after the reorganization, and, through its board of directors, will be able to exercise voting control over most matters put to a vote of our shareholders.  The same directors and officers who manage [Prudential] and Prudential Savings Bank also will manage [MHC].  No assurances can be given that [MHC] will not take action which the minority shareholders believe to be contrary to their interests.  For example, [MHC] could revise the Prudential Savings Bank's dividend policy, approve the implementation of stock benefit plans, prevent a sale or merger transaction or defeat a candidate for [Prudential's] board of directors or other proposals put forth by minority shareholders.

(Prospectus 15.)

On March 29, 2005, the reorganization of Prudential Savings Bank into a mutual holding company structure and the IPO were completed.  (Compl. ¶ 36.)  On May 9, 2005, plaintiff made its first purchase of Prudential stock in the open market, and through June 2005, continued to

4

purchase over one million shares of Prudential stock. (*Id.*) Prior to making its initial stock purchase, plaintiff received and reviewed a copy of the prospectus. (*Id.*) In making its purchases, plaintiff relied on its understanding of the prospectus that it promised that MHC would be excluded from any shareholder vote to approve the stock plans. (*Id.* ¶¶ 37-38.) Because plaintiff believed that this promise was an important safeguard against self-dealing by the MHC/Prudential directors and ensured that minority investors would be able to judge for themselves whether Prudential's directors were acting consistently with the minority shareholders' interests, plaintiff alleges it would not have purchased its shares of Prudential stock had it known that MHC would be permitted to vote on the approval of the stock plans, and thus control the outcome of the vote. (*Id.* ¶ 38.)

On or about June 16, 2005, Prudential and Vento were informed that plaintiff and other related investors ("the Stilwell group"), who collectively held the largest minority stake in Prudential, owned in excess of 5% of Prudential's shares and planned to file a Schedule 13D with the SEC disclosing their stock purchases and investment intentions. (Compl. ¶ 39.) In addition, Prudential and Vento learned that Joseph Stilwell,[4] or another member of the Stilwell group, wished to be named a Prudential director, and that SVP might oppose the stock plans and solicit proxies from other minority shareholders to oppose the stock plans. (*Id.* ¶ 39.)

MHC's directors then took steps that plaintiff believed would enable MHC to vote on the stock plans. (Compl. ¶ 40.) At the direction of MHC's directors, Prudential's counsel wrote to the Federal Deposit Insurance Corporation ("FDIC") asking it to interpret its regulations so as to

---

[4]SVP's general partner is Stilwell Value LLC, which is solely owned and managed by Joseph Stilwell. Stilwell has the sole authority to direct the investment decisions of SVP, including its stock purchases of Prudential. (Compl. ¶ 7.)

permit MHC to participate in the approval of the stock plans if the shareholder vote were held more than one year after the reorganization and IPO.  (*Id*. ¶ 41.)  Defendants received a letter from the FDIC containing its favorable approval their interpretation of the regulations on July 6, 2005, but defendants did not disclose the letter until nine months later, on April 6, 2006, in connection with the announcement of a special shareholders meeting to vote on the stock plans. (*Id.* ¶ 42.)

On July 27, 2005, Vento informed Stilwell that MHC's directors declined to invite Stilwell or another representative of the Stilwell group to join the Prudential Board.  (Compl. ¶ 43.)  Thereafter, on August 5, 2005, the Stilwell group filed a Schedule 13D disclosing its intention to solicit proxies opposing the approval of the stock plans and, unlike other shareholder votes that would be controlled by MHC, stating the adoption of the stock plans would be determined by minority investors as MHC was not permitted to vote.  (*Id*. ¶ 15.)  Defendants then delayed the voting on the stock plans.  (*Id.* ¶ 45.)  The Stilwell group solicited proxies from the minority shareholders to withhold their votes on the election of the director defendants as a referendum that the stock plans should not be implemented unless a representative of the Stilwell group were invited to join the Prudential Board.  (*Id*. ¶ 46.)  At the February 3, 2006 annual meeting, 71% of Prudential's voting public shares were withheld from voting on the election of the director defendants.  (*Id*. ¶ 46.)

On April 6, 2006, two months after the annual meeting and a week and one year after the reorganization, Prudential announced its intention to call a special shareholders meeting to vote on the approval of the stock plans and, additionally, disclosed that it had received an opinion letter from the FDIC that FDIC regulations would not prohibit MHC from voting on the stock

plans one year after the organization. (Compl. ¶ 47.) The Stilwell group filed a form 14A with the SEC on April 13, 2006 stating its intention to solicit proxies from other shareholders to oppose the stock plans and that it would challenge the FDIC's advice. (*Id*. ¶ 48.) On April 19, 2006, Prudential announced that it had determined to postpone the special shareholders meeting to ensure that no uncertainty exists with respect to the vote standard applicable to approval of the stock plans. (*Id*. ¶ 49.) On September 22, 2006, the Deputy Secretary of the Federal Reserve Board informed Prudential's counsel that the Board, like the FDIC, would not oppose MHC's participation in a vote on the stock plans. (*Id*. ¶ 50.) On September 27, 2006, Prudential announced that passage of the stock plans would be assured because MHC would participate in the voting. (*Id*. ¶ 50.)

### B. Federal Banking Regulations

The FDIC is Prudential's primary regulator. (Compl. ¶ 33.) The FDIC is the primary federal regulator of banks that are chartered by the states that do not join the Federal Reserve System. In addition, the FDIC is the back-up supervisor for the remaining insured banks and thrift institutions. The Office of Thrift Supervision ("OTS") regulates all federal and many state-chartered thrift institutions, which include federal savings banks and savings and loan associations. The FDIC and the OTS have both issued similar, but not identical, regulations concerning the issuance of stock option plans or management or employee stock benefit plans after the reorganization from the mutual to stock form of ownership. *See* 12 C.F.R.§ 333.4 (FDIC regulations); 12 C.F.R. § 536b.500 (OTS regulations). Both sets of regulations place limitations on the implementation of stock benefits plans for one year from the date of conversion. *See* 12 C.F.R. § 333.4(e); 12 C.F.R. § 563b.500(a). The FDIC regulations,

originally issued November 30, 1994, state, in pertinent part:

> [N]o converted insured mutual state savings bank shall, for one year from the date of the conversion, implement a stock option plan or management or employee stock benefit plan, other than a tax-qualified employee stock ownership plan, unless each of the following requirements is met:
> . . .
> (3) In the case of a savings bank subsidiary of a mutual holding company, all such plans are approved by a majority of stockholders other than its parent mutual holding company prior to implementation at a duly called meeting of shareholders, either annual or special, to be held no sooner than six months following the stock issuance[.]

12 C.F.R. § 333.4(e).  The OTS regulations, issued August 9, 2002, state, in relevant part:

> (a) You may implement a stock option plan or management or employee stock benefit plan within 12 months after your conversion, if you meet all of the following requirements.
> . . .
> (7) Your shareholders approve each plan by a majority of the total votes eligible to be cast at a duly called meeting before you establish or implement the plan.  You may not hold this meeting until six months after your conversion.  If you are a subsidiary of a mutual holding company, a majority of the total votes eligible to be cast (other than your parent mutual holding company) must approve each plan before you may establish or implement the plan.

12 C.F.R. § 563b.500(a).

General Counsel of the OTS issued a letter on September 17, 2004 interpreting the voting requirements contained in § 563b.500(a)(7) to apply to proposed management and employee stock benefit plans that are to be implemented by subsidiary holding companies in a mutual holding company structure regardless of the length of time that has elapsed after the public offering.  *Voting Requirements for Benefit Plans Implemented After a Minority Stock Issuance in Mutual Holding Company Structure*, Op. OTS Chief Counsel, P-2004-6, 2004 OTS LEXIS 2 (Sept. 17, 2004).  In other words, the parent mutual holding company would always be ineligible

to vote on the issuance of a stock benefit plan. *See id.*; *see also* Stock Benefit Plans in Mutual-to-Stock Conversions and Mutual Holding Company Structures, 72 Fed. Reg. 35145, 35148 (Office of Thrift Supervision June 27, 2007) (concluding "that it is appropriate to continue to impose the separate minority shareholder vote requirement for stock benefits plans in MHC structures, regardless of the amount of time that has passed since the most recent Minority Stock Issuance."). The FDIC has not issued any formal interpretation of its regulations other than the letter solicited by Prudential that is contrary to the OTS interpretation. *See* Stock Benefit Plans in Mutual-to-Stock Conversions and Mutual Holding Company Structures, 72 Fed. Reg. at 35146 (stating that "[o]ne comment noted that the staff of the [FDIC] has provided advice that the lack of a minority vote after one year is acceptable," and citing letter from the FDIC Risk Management and Applications Section).

Plaintiff's interpretation of the promise in the prospectus was that it was independent of but consistent with the federal banking regulations in effect at the time of the IPO. (Compl. ¶¶ 33-34.) Specifically, the fact that the regulatory structure was consistent with the alleged promise in the prospectus served to buttress Prudential's commitment to its minority shareholders. (*Id.* ¶ 34.) However, the prospectus nowhere disclosed or stated that the limitations on MHC's voting were tied to or a product of the existing regulatory structure, or that MHC's exclusion from voting on the stock plans could be modified by regulatory action. (*Id.* ¶¶ 34-35.)

### C. Procedural History

Plaintiff instituted the instant complaint against defendants asserting the following claims: defendants Prudential and MHC are barred by promissory estoppel from conducting a

vote on the stock plans in which MHC participates (Count I); director defendants and MHC have breached their fiduciary duty to plaintiff (Count II); director defendants and MHC will be unjustly enriched if MHC is allowed to vote on the approval of the stock plans (Count III); and all defendants will have effected an unfair dilution and disenfranchisement on public shareholders such as plaintiff, in violation of Pennsylvania statutes prohibiting unfair corporate voting, if the vote is not enjoined (Count IV).

Plaintiff requests declaratory and permanent injunctive relief prohibiting MHC from participating in the approval of the stock plans.  In the alternative, if no injunction is issued and MHC is permitted to vote, plaintiff seeks damages and/or restitution in an amount to be determined at trial.  Plaintiff also seeks costs and disbursements, including reasonable attorney fees.

Defendants have filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  With respect to Count I, defendants argue that the prospectus contains no promise sufficient to meet the standard required for a claim of promissory estoppel.  Defendants request Count II be dismissed as to MHC because it is based on the non-existent "promise" contained in the prospectus and against the director defendants because, under Pennsylvania law, plaintiff has no standing to bring a direct action against the director defendants for breach of fiduciary duty.  Defendants argue that Counts III and IV should also be dismissed because they are based on the same non-existent "promise" in the prospectus.  Lastly, defendants argue that the court should dismiss the complaint with prejudice because any attempt to amend the complaint would be futile.  Plaintiff has filed a response.

**II. Standard of Review**

10

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint.  *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir. 1980) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In evaluating a motion to dismiss, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party.  *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989) (citing *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273 (3d Cir. 1985)).  The court may dismiss a complaint, "only if it is certain that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Swin Res. Sys., Inc. v. Lycoming County,* 883 F.2d 245, 247 (3d Cir. 1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  However, a court need not credit a plaintiff's "bald assertions" or "legal conclusions."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

## III. Discussion

### A. Count I:  Promissory Estoppel

In Pennsylvania, the elements of promissory estoppel are 1) the defendant makes a promise that he reasonably expects to induce action or forbearance by the plaintiff; 2) the promise induces action or forbearance by the promisee; and 3) injustice can only be avoided by enforcing the promise.  *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990).  A broad and vague implied promise is insufficient to satisfy the first element.  *See C&K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) ("Promissory estoppel would be rendered meaningless if this Court were to allow [the plaintiff] to maintain an action for detrimental reliance based on the alleged existence of such a broad and vague implied

promise . . . Since there is no express promise . . . we will affirm . . . dismissal.").  In order to

qualify as an express promise, "[t]he promise must be certain and explicit enough so that the full

intention of the parties may be ascertained to a reasonable certainty."  *Ankerstjerne v.*

*Schlumberger Ltd.*, 2004 U.S. Dist. LEXIS 9927, at *14 (E.D. Pa. May 12, 2004), *aff'd*, 155 F.

App'x 48, 51 (3d Cir. 2005); *see also*, *Jersey Constr., Inc. v. Pennoni Assocs., Inc.*, 1993 U.S.

Dist. LEXIS 2018, at *13 (E.D. Pa. Feb. 4, 1993) (characterizing requirement of first element as

a "clear and reasonably certain promise").

 Plaintiff's claim fails as a matter of law because the statements in the prospectus do not

constitute an "express promise" that is "certain and explicit enough" or "clear and reasonably

certain" so as to ascertain the intention of the parties.  Plaintiff's interpretation of the prospectus

requires too many inferential steps to be considered "certain and explicit."  Plaintiff infers that

because a vote on the stock plans was not assured, that must mean that defendants were

promising that MHC would not vote on those plans.  However, there is no clear indication in the

prospectus that defendants were warranting that MHC would not participate in the approval of

the stock plans.[5]  Moreover, plaintiff's interpretation is undermined by the "Risk Factors"

section, which specifically warns that MHC "through its board of directors, will be able to

exercise voting control over most matters put to a vote of [its] shareholders," including "the

---

[5]Although it is certainly true that defendants did not warn specifically in the prospectus
that after one year the passage of the stock plans would be a certainty, there are also other
plausible interpretations of the language in the prospectus.  If defendants had submitted the stock
plans for shareholder approval after six months but before one year after the reorganization, there
would be no assurance the stocks plans would be approved, consistent with FDIC regulations.  It
is also plausible that the prospectus is simply confusing and internally inconsistent, in which case
it would still not meet the standard of a promise to support a claim of promissory estoppel, i.e.,
"certain and explicit enough so that the full intention of the parties may be ascertained to a
reasonable certainty."

implementation of stock benefit plans," regardless of whether those plans were the ones specifically contemplated in the reorganization.  (Prospectus 15.)  At best, the promise plaintiff reads from the prospectus is "a broad and vague implied promise," which is insufficient to establish a claim of promissory estoppel.  *C&K Petroleum Prods.*, 839 F.2d at 192; *see also Nabisco, Inc. v. Ellison*, 1994 U.S. Dist. LEXIS 16041, at *18 (E.D. Pa. Nov. 9, 1994) ("Allowing a claim for promissory estoppel to be based on an implied promise would in effect allow a claim to be based upon the plaintiff's subjective expectations.").  As such, I will grant defendant's motion to dismiss Count I.

## B.  Count II:  Breach of Fiduciary Duty

Count II of plaintiff's complaint asserts a breach of fiduciary duty claim against MHC and against the director defendants.  Defendants' motion to dismiss with respect to Count II will be granted in part because plaintiff does not have standing to bring a claim of breach of fiduciary duty against the director defendants; the remainder will be denied.

### 1. Breach of fiduciary duty by MHC

Plaintiff bases its breach of fiduciary duty claim against MHC on MHC's position as a majority shareholder vis-a-vis plaintiff as a minority shareholder.  (Compl. ¶ 63.)  The Pennsylvania Supreme Court has stated:

> It has long been recognized that majority shareholders have a duty to protect the interests of the minority . . . "majority stockholders occupy a quasi-fiduciary relation toward the minority which prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise."

*Ferber v. Am. Lamp Corp*., 469 A.2d 1046, 1050 (Pa. 1983) (emphasis omitted) (quoting *Hornsby v. Lohmeyer*, 72 A.2d 294, 298 (Pa. 1950)); *see also Tyler v. O'Neill*, 994 F. Supp. 603,

612 (E.D. Pa. 1998) (stating that "under Pennsylvania law, majority shareholders or group of shareholders who combine to form a majority, are fiduciaries, and they may not use their voting power to benefit themselves personally at the expense of the minority").  In explaining this duty, the Pennsylvania Supreme Court has noted, "In the broader sense the holder of the majority of the stock owes to the other stockholders and the corporation the duty to exercise good faith, care, and diligence to conserve the property of the corporation and to protect the interests of the minority stockholders . . ."  *Weisbecker v. Hosiery Patents, Inc.*, 51 A.2d 811, 814 (Pa. 1947); *see also Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 100-01 (3d Cir. 2001) ("A shareholder in such a position is under close scrutiny, and is expected to conform to the highest standards of conduct.").  However, this principle "does not mean, of course, that majority shareholders may never act in their own interest, but when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation."  *Ferber*, 469 A.2d at 1050 (citing *Weisbecker*, 51 A.2d at 814, 817).

The test of liability for breach of fiduciary duty is whether the officer, director, or shareholder was unjustly enriched by the challenged actions.  *Tyler*, 994 F. Supp. at 612.  The Third Circuit has had the opportunity to address this issue finding that "Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when the fiduciary acts to benefit himself while in the fiduciary role."  *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 101 (citing *Ruggieri v. West Forum Corp.*, 282 A.2d 304, 307 (Pa. 1971)).

Plaintiff alleges that MHC will violate its fiduciary duty to plaintiff by participating in a

vote on the stock plans.[6]  Because MHC stands in a fiduciary relationship to plaintiff, and MHC's participation in the vote will benefit MHC by allowing it to control the outcome of the vote, MHC bears the burden of proving that its participation in a vote on the stock plans will not unjustly enrich MHC and that it will be fair and not fraudulent.  Because it is impossible to make such a determination at this early stage of the proceeding, I will deny defendants' motion to dismiss plaintiff's fiduciary duty claim against MHC in Count II.

### 2. Standing for claim against the director defendants

Count II of the complaint also asserts a claim for breach of fiduciary duty against the director defendants.  Plaintiff states that the director defendants "stand in a fiduciary relationship to Prudential's shareholders, including SVP, and owe SVP a duty of loyalty and good faith conduct."  (Compl. ¶ 62.)  Plaintiff further avers that director defendants owe "an undivided and unselfish loyalty to the interests of the shareholders, not only affirmatively to protect their interests but also to refrain from doing anything that would work injury to their interests."  (*Id.*)  Defendants contend that Count II of plaintiff's complaint asserted against the director defendants must be dismissed because the director defendants do not stand in a fiduciary relationship to plaintiff and, pursuant to section 1717 of the Pennsylvania Business Corporation Law ("BCL"), plaintiff lacks standing to bring a direct claim for breach of fiduciary duty against the corporation's directors.  I agree.

---

[6]As noted by defendants, it is somewhat unclear which actions plaintiff claims were perpetrated by director defendants and which by MHC.  (*See* Def.'s Reply Supp. Mot. Dismiss 4 n.5.)  This is understandable as most of the director defendants, in reality, control MHC.  Because this is a motion to dismiss and plaintiff has pled an entire course of conduct carried out by defendants together, I will also assume that MHC was involved in the decision to postpone voting on the stock plans.  (*See* Pl.'s Mem. Supp. Mot. Dismiss 18 n.15 (stating that "MHC is accountable for its pivotal role in the success of the Director Defendants' improper scheme").)

The text of section 1717 states:

> The duty of the board of directors, committees of the board and individual directors under section 1712 (relating to standard of care and justifiable reliance) is solely to the business corporation and may be enforced directly by the corporation or may be enforced by a shareholder, as such, by an action in the right of the corporation, and may not be enforced directly by a shareholder or by any other person or group.

15 Pa. Cons. Stat. § 1717.  The plain language of the statute precludes a direct suit for breach of fiduciary duty of the type brought by plaintiff.  *Id.*; *see also* § 1712 ("A director of a business corporation shall stand in a fiduciary relation to the corporation . . ."); Robert Goodyear Murray, *Money Talks, Constituents Walk:  Pennsylvania's Corporate Constituency Statute Can Maximize Shareholders' Wealth*, 48 Buff. L. Rev. 629, 645-46 (2000) ("[S]ections 1712, 1715, 1716, and 1717 consistently refer to acting in the best interests of the corporation, making it clear that '[t]he overriding mandate is that the directors' duty is owed solely to the corporation, not to the shareholders or any other group.'").

The legislative history similarly endorses such a view.  In reaction to a rise in hostile takeover bids, the BCL was amended in the 1980s and 1990s in order to protect Pennsylvania corporations from such bids.  *See B.T.Z., Inc. v. Grove*, 803 F. Supp. 1019, 1021 (E.D. Pa. 1992).  Pennsylvania became the first state to enact a corporate constituency statute, which allows, but does not mandate, directors to consider the interests of various stakeholders when determining whether an action is in the best interest of the corporation.  *See* §§ 1712, 1716.  In doing so, the boards of directors were given vastly greater discretion.  *See* Murray, *supra*, at 630-32 (noting that commentators have argued that constituency statutes, like those of Pennsylvania, allow management to chose courses of action that are inconsistent with traditional notions of shareholder primacy and enable management to disregard the best interests of the shareholders in

16

favor of other stakeholders).

In addition to numerous other anti-takeover provisions, in 1990, protections for directors against breach of fiduciary duty claims were added, including sections 1715 and 1717.  The Draftmen's Comment to section 1717 states:

> This section reaffirms the statutory concept (*see e.g.,* 15 Pa.C.S. §§ 1712, 1715 and 1716) that the directors' duty is owed solely to the corporation.  It therefore limits standing with respect to an asserted breach of duty by directors to the corporation itself or to shareholders suing as such in a secondary or derivative action . . . Therefore, although 15 Pa.C.S. §§ 1515(a) and (b) and 1716 permit directors to consider the interests of various groups, it does not provide *any* of these groups standing to sue if their interests, as such, are not considered.

William H. Clark & W. Edward Sell, *Bisel's Pennsylvania Business Associations Lawsource* 181 (2d ed. 2001).  In addition, one of the drafters of the provision has elaborated:  "The corporate constituency statutes reflect the early and traditional jurisprudence relating to director obligations, which made it clear that a director's sole duty was to the corporation and not the shareholders."  David M.H. Wallman, *The Proper Interpretation of Corporate Constituency Statutes and Formulation of Director Duties*, 21 Stetson L. Rev. 163, 166 (1991).  Thus, the intent of the statute was to supplement the corporate constituency provisions and clarify that lawsuits predicated on an independent fiduciary duty to shareholders may not be brought.

Cases that have discussed the 1990 amendments to the BCL have concluded similarly.  In *Malmros v. Jones*, 2004 U.S. Dist. LEXIS 4371 (E.D. Pa. Feb. 27, 2004), the plaintiff brought an action alleging breach of fiduciary duty and self dealing against the defendant in her capacity as a former director of the corporation of which plaintiff was a shareholder and former director.  *Malmros*, 2004 U.S. Dist. LEXIS 4371, at **1-6.  The court dismissed plaintiff's claim holding that under section 1717, "a member of a corporate board of directors has a fiduciary duty only to

17

the corporation and not to individuals," therefore plaintiff lacked standing to bring his claim. *Id.* at \*\*7-8; *see also Winer Family Trust v. Queen*, 2004 U.S. Dist. LEXIS 19244, at \*\*77-80 (E.D. Pa. Sept. 27, 2004) (granting motion to dismiss as to a breach of fiduciary duty claim in a class action because the lead plaintiff did not have standing to bring a direct claim for breach of fiduciary duty against a former president, chief executive officer, and director of a company during the fiduciary class period under § 1717); *B.T.Z., Inc.*, 803 F. Supp. at 1022 (dismissing class action on behalf of shareholders because plaintiff's claims were, in reality, claims on behalf of the corporation as a whole and, as such, plaintiff had no standing under the amended BCL).

Plaintiff contends that the addition of section 1717 does not alter the common law right of a shareholder to bring a claim where the shareholder only, and not the corporation, has suffered an injury. As one district court has acknowledged, "Prior to the 1990 amendments to the Pennsylvania BCL, some courts had "carved out an exception, permitting a cause of action in favor of the individual shareholder, where the alleged wrong violates a duty owed directly to the shareholder . . . Thus there must be a duty owed to the shareholder personally." *Malmros,* 2004 U.S. Dist. LEXIS 4371, at \*11 (quoting *Cole v. Ford Motor Co.*, 566 F. Supp 558, 569 (W.D. Pa. 1983)). The cases plaintiff cites in support of its right to bring such a claim do not discuss the effect of the 1990 amendments or otherwise support its argument. For example, in *Sims v. Exeter*, 868 F. Supp. 677 (E.D. Pa 1994), the court did not discuss the 1990 amendments to the BCL and the alleged duty owed to the plaintiff was based on a contract, not any purported fiduciary duty owed to shareholders. *Sims*, 868 F. Supp. at 682. *Haymond Napoli Diamond, P.C. v. Haymond*, 2004 U.S. Dist. LEXIS 17276 (E.D. Pa. Aug. 27, 2004), is also not helpful because although the court overstated the fiduciary duty, that the "[o]fficers and directors of a

18

corporation owe a fiduciary duty—a duty of loyalty—to the corporation and to its shareholders to act only for the benefit of the corporation and the shareholders," 2004 U.S. Dist. LEXIS 17276, at *44, the breach of fiduciary duty claims that the court upheld were predicated on the defendants' status as majority shareholders, *id.* at **46-47. In fact, in a later opinion, the court held that the shareholder was not permitted to bring a direct action for breach of fiduciary that should have been asserted derivatively. *Haymond, Napoli Diamond, P.C. v. Haymond*, 2005 U.S. Dist. LEXIS 15841, at *13 (E.D. Pa. Aug. 2, 2005). In *In re Specialty Tape Corp.*, 132 B.R. 297 (Bankr. W.D. Pa. 1991), although the court similarly overstated the duties owed by directors, the court's finding of director liability was predicated on acts that took place before 1990 and it awarded recovery to the debtor corporation against its former directors, not the individual shareholders. *In re Specialty Tape Corp*, 132 B.R. at 300-01. Although holding "that tinkering with corporate elections to interfere with shareholders' electoral rights violates a director's fiduciary duty to shareholders and is enjoinable," *Jewelcor Management, Inc. v. Thistle Group Holdings Co.*, 60 Pa. D. & C. 4th 391 (Pa. C.P. 2002) is of limited persuasiveness because it is a case from the Pennsylvania Court of Common Pleas, does not discuss the BCL, and relies principally on a case from Delaware. *Jewelcor Mgmt., Inc.*, 60 Pa. D. & C. 4th at 402, 404-05.

A shareholder's right to bring a direct action against the corporation exists in other contexts—e.g. the right to bring suit against directors for violation of some independent right owed to the shareholder. *See Zinman v. FDIC*, 567 F. Supp. 243, 246 (E.D. Pa. 1983) (citing *In re Penn Cent. Sec. Litig.*, 347 F. Supp. 1324, 1326 (E.D. Pa.1972)) (noting that a shareholder may bring an individual action "[i]f the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is

a party, or on a right belonging severally to him, or on a fraud affecting him directly").  However, the language of the BCL, as discussed above, explicitly precludes an action by a shareholders for breach of fiduciary duty by a corporation's directors.  The fact that the shareholders may have suffered injury distinct from the corporation is irrelevant because there simply is no duty running from the directors to the shareholders.  And, to the extent that this duty existed prior to the amendments to the BCL, the plain language and legislative history of the amendments make clear that the duty does not currently exist.  I will, therefore, dismiss plaintiff's fiduciary duty claim against the director defendants in Count II.

### C.  Count III:  Unjust Enrichment

Count III asserts a claim of unjust enrichment against MHC and the director defendants. Defendants contend that Count III of plaintiff's complaint should be dismissed because it is based on the "illusory" promise contained the prospectus.  Plaintiff responds that it has demonstrated that the prospectus contained an actionable promise and, moreover, that the director defendants' manipulation of the timing of the vote on the stock plans undermines plaintiff's voting rights, both of which support plaintiff's claim of unjust enrichment.

Under Pennsylvania law, a claim for unjust enrichment requires three elements:  "benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable or unjust for the recipient to retain the benefits without payment of value."  *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 477 (3d Cir. 2000) (alteration and citation omitted).  The most important factor is whether the enrichment of the defendant is unjust; a claim for unjust enrichment cannot be made simply because the defendant may have been benefitted in some way.

20

*Walter v. Magee-Women's Hosp.*, 876 A.2d 400, 407 (Pa. Super. Ct. 2005); *Konidaris v. Portnoff Law Assocs., Ltd.*, 884 A.2d 348, 355 (Pa. Commw. Ct. 2005). The claim for unjust enrichment has also been stated by the Third Circuit as requiring "the claimant [to] show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (citing *Torchia v. Torchia*, 499 A.2d 581, (Pa. Super. Ct. 1985)). The Superior Court of Pennsylvania, in a case cited by the Third Circuit, has clarified that a "showing of knowledge or wrongful intent on the part of the benefited [sic] party is not necessary in order to show unjust enrichment." *Torchia*, 499 A.2d at 583 (citing *Crossgates Realty, Inc. v. Moore*, 420 A.2d 1125, 1128 (Pa. Super. Ct. 1980)).

Assuming that MHC and the director defendants benefitted in some way at the expense of plaintiff—by reneging on the alleged promise and manipulating the timing of the vote on the stock plans—as a matter of law it cannot be said that would it be "unconscionable" or "unjust" for MHC and the director defendants to retain that benefit. The facts alleged do not meet this standard. There was nothing in the prospectus that affirmatively stated that minority shareholders would be entitled to vote on the stock plans at issue. In fact, to the contrary, the sectioned entitled "Risk Factors" in the prospectus warned of the possibility that MHC "through its board of directors, will be able to exercise voting control over most matters put to a vote of [its] shareholders." (Prospectus 15.) It specifically cautioned that "[n]o assurances can be given that [MHC] will not take action which the minority shareholders believe to be contrary to their interests," and gave as a particular example that MHC "could . . . approve the implementation of stock benefit plans." (*Id.*) Thus, this section gave notice that MHC could adopt stock benefit

21

plans—regardless of whether they were the specific plans at issue or any other plans—without the approval of the minority shareholders.  Moreover, the actions taken by MHC and the director defendants are entirely consistent with the plain language of the applicable FDIC regulations. *See supra*, Part I.B.  These regulations make no mention of any limitation on the voting rights of the majority shareholders after this one year period.  Hence, the course of action plaintiff alleges by which MHC and the director defendants improperly secured a benefit at plaintiffs expense was warned of in the prospectus and was legal under the relevant regulations.  As a matter of law, plaintiffs allegations cannot be said to rise to the level of "unconscionable" or "unjust," and I will grant defendants' motion to dismiss Count III for unjust enrichment.

### D. Unfair Dilution and Disfranchisement

Count IV asserts a claim against all defendants.  Plaintiff avers that sections 1709(c) and 1765(a)(3) of the BCL require fairness in the rules and conduct of a shareholder meeting and vote (Compl. ¶ 81-82), and that section 1105 entitles shareholders to an injunction if fraud or fundamental unfairness is present (*id.* ¶ 83).  Further, section 1757 of the BCL authorizes corporate action by "the affirmative vote of a majority of votes cast by all shareholders, *entitled to vote thereon*" (*id.* ¶ 84 (emphasis in original)), which plaintiff contends, due to the promise in the prospectus, MHC is not so entitled (*id.* ¶ 85).

Defendant asserts that this count must be dismissed because it is also based on the non-existent promised alleged to be in the prospectus.  Plaintiff responds that the promise in the prospectus is actionable and that because director defendants' "manipulative conduct would serve to nullify the voting rights of [plaintiff], any vote on the [s]tock [p]lans in which MHC participated would be fundamentally unfair and violate the [BCL]."  (Pl. Mem. Supp. Mot.

Dismiss 24.)  Sections 1709, 1765 and 1757, cited by plaintiff, are merely procedural in nature, governing shareholder meetings and elections.  Plaintiff correctly notes that actions that affect a shareholder's right to vote may be actionable where fundamental unfairness is present.  *See Warehime v. Warehime*, 777 A.2d 469, 777, 481 n.15 (Pa. Super. Ct. 2001), *rev'd*, 860 A.2d 41 (Pa. 2004) (setting aside vote on stock plan where "opposition shareholders were completely divested of any power to affect the outcome of any vote in which there was disagreement," which constituted "fundamental unfairness"); § 1105 ("A shareholder of a business corporation shall not have any right to obtain, in the absence of fraud or fundamental unfairness, an injunction against any proposed plan or amendment of articles authorized under any provision of this subpart . . . ."

As a matter of law, under the facts plaintiff alleges, fundamental unfairness is absent.  As mentioned previously, the prospectus disclosed the potential for MHC to determine the outcome of any vote on shareholder benefits plans and the FDIC regulations plainly allowed for such a vote to take place one year after the reorganization, as occurred in the instant case.  Thus defendants' actions were legal and contemplated by the prospectus, regardless of whether the meeting was held after the time during which the minority shareholders would be able to determine the outcome of any vote.  As such, allowing MHC to vote in such circumstances cannot said to be so egregious that it constitutes "fraud" or "fundamental unfairness," and I will grant defendants' motion to dismiss Count IV of plaintiff's complaint.

### E. Leave to Amend

Defendants assert that I should dismiss any counts of the complaint with prejudice because any attempt made by plaintiff to amend would be futile as all of plaintiff's claims are

based on what defendants contend is a non-existent promise in the prospectus.  Thus, there is nothing that plaintiff can do to supplement its claims.

Under the Federal Rules of Civil Procedure, a plaintiff is entitled to amend the claim once; courts may grant subsequent amendments "when justice so requires."  Fed. R. Civ. P. 15(a).  "While this Rule also requires that leave to amend should be 'freely given,' a district court has the discretion to deny this request if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party.  *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Defendants are correct that, with respect to Counts I, III and IV, any attempt to amend the pleadings will be futile.  Similarly, any attempt to amend the complaint with respect to plaintiff's claim of breach of fiduciary duty against the director defendants would be futile as plaintiff does not have standing to bring such a claim.  As such, Counts I III and IV, and Count II with respect to plaintiff's breach of fiduciary duty claim against the director defendants, will be dismissed with prejudice.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STILWELL VALUE PARTNERS I, L.P. | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-4432 |
| | : | |
| PRUDENTIAL MUTUAL HOLDING CO., et al., | : | |
| Defendants. | : | |
| | : | |

## ORDER

AND NOW, this _____ day of August, 2007, upon consideration of defendants' motion to dismiss (Doc. No. 9), plaintiff's response thereto, and defendants' reply, and after hearing, it is hereby ORDERED that the motion is:

(1) DENIED with respect to Count II of plaintiff's complaint for breach of fiduciary duty by MHC, and

(2) GRANTED as to Counts I, III and IV, and the remainder of Count II, plaintiff's claim for breach of fiduciary duty by the director defendants, which claims are dismissed with prejudice.


_____
William H. Yohn Jr., Judge

25