# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| STILWELL VALUE PARTNERS I, L.P., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-4432 |
| | : | |
| PRUDENTIAL MUTUAL HOLDING CO., | : | |
| Defendant. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                                 April ____, 2008

Presently before the court are cross-motions for summary judgment filed by the remaining defendant in this case, Prudential Mutual Holding Company ("MHC"), and plaintiff Stilwell Value Partners I, L.P.  At issue is Count II, the remaining count in the Complaint.  In Count II, plaintiff alleges that MHC, as the majority shareholder of Prudential Bancorp, Inc. ("Prudential"), breached its fiduciary duties owed to plaintiff, a minority shareholder of Prudential, with respect to the timing of a shareholder vote to approve a stock recognition and retention plan ("SRRP") and a stock option plan ("SOP") (collectively, the "stock plans") that would benefit Prudential's officers, directors, and employees at a cost to the minority shareholders.  Plaintiff further alleges that MHC's anticipated vote in favor of adoption of these stock plans would violate MHC's fiduciary duties owed to Prudential's minority shareholders, including plaintiff.

I.      **Factual and Procedural Background**

A.      **Corporate Structure**

Prudential and MHC are Pennsylvania corporations that were created after the conversion and reorganization of Prudential Savings Bank (the "Bank") from a mutual savings bank to a three-tiered mutual holding company structure.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 1 ("Prospectus") 1-2.)  As a result of the reorganization, Prudential, a publicly-traded corporation, became the sole owner of the Bank.  (*Id.*)  Prudential, in turn, is 55% owned by MHC, a mutual holding company that has no authorized capital stock, has no shareholders, and is controlled by its directors who elect themselves and their successors.  (*Id.* at 1.)  The directors of MHC, through MHC's majority stock ownership of Prudential, can determine the outcome of any Prudential shareholder vote in which MHC participates.  (*Id.* at 105.)  The remaining 45% minority interest in Prudential was sold to the public in an initial public offering ("IPO").  (*See* Vento Dep. 65:13-17, Jan. 17, 2008.)  Plaintiff is one of the minority shareholders of Prudential. Prudential noted the following "[r]easons for [c]onducting the [m]utual [h]olding [c]ompany [r]eorganization":

> With the mutual holding company structure, we will be able to develop long-term growth opportunities and access the capital markets more easily in the future since our new structure will permit us to issue capital stock, a source of capital not available to a mutual savings bank.  The offering also will increase the amount of funds available to us for lending and investment.  This will provide greater flexibility to diversify and expand operations in our current market area and neighboring communities.  The offering will also offer our depositors, employees, management and directors with an equity interest in [Prudential] and thereby obtain an economic interest in its future success.  In addition, *we will be able to provide stock-based incentives to our officers, employees and directors* which will help us retain and attract talented persons.

(Prospectus 2-3 (emphasis added).)

Immediately after the conversion to the mutual holding company structure, the directors of MHC were Thomas Vento, John Judge, Joseph Packer, and Charles Santoro.  (*See id.* at 81.) These men were also the directors of Prudential and the Bank.  (*Id.* at 15.)  The current directors of MHC, Prudential, and the Bank are Vento, Balka, Packer, A.J. Fanelli, and Francis Mulcahy. (Def.'s Resp. to Pl.'s Facts ¶ 4.)  Because of the mutual holding company structure, the directors essentially elect themselves:  The MHC board elects new directors of MHC.  MHC is the majority shareholder of Prudential, and Prudential's directors are elected by its shareholders; therefore, MHC can control the election of Prudential's directors.  Prudential owns all the stock in the Bank, and therefore controls the election of the Bank's directors. (*See* Prospectus 105.)

During the period relevant to these motions, the directors held joint meetings of the boards of MHC, Prudential, and the Bank.  (*See, e.g.*, Pl.'s Mem. Supp. Mot. Summ. J. Ex. C.) At those joint meetings, the acts of the three entities were taken through separate corporate resolutions.  (*See id.*; *see also* Vento Dep. 57:20-58:9 ("The chairman will announce a resolution for either entity and identify it that way.").)  Despite this observation of separate corporate formalities, however, some of the directors testified that they did not perceive a difference between acting for one of the entities and acting for another.  (*See* Balka Dep. 28:3-7, Jan. 15, 2008; Judge Dep. 20:21-21:3, Jan. 14, 2008; Fanelli Dep. 29:4-10, Dec. 4, 2007.)  On the other hand, some directors considered the roles to be distinct.  (*See* Corrato Dep. 140:1-141:3, Jan. 18, 2008; Mulcahy Dep. 12:23-13:4, Dec. 7, 2007; Vento Decl. ¶ 2.)

### B.    Stock Plans

As recognized above, one reason for the conversion to the mutual holding company

3

structure was to provide stock-based incentive plans.  The prospectus details the stock plans that are at issue in this case.[1]  (Prospectus 9-10, 87-88.)  The prospectus states that implementation of the stock plans will require shareholder approval and will be submitted for approval no earlier than six months after completion of the reorganization.  (Prospectus 14, 17, 28, 87-88.)

According to plaintiff's reading of the prospectus, the prospectus promises that the vote on the stock plans will be submitted only to Prudential's minority shareholders—i.e., that MHC will be excluded from voting.[2]  (Compl. ¶ 29.)  However, in the section labeled "Risk Factors," the prospectus disclosed the following:

> [MHC] will own a majority of our common stock after the reorganization, and, through its board of directors, will be able to exercise voting control over most matters put to a vote of our shareholders.  The same directors and officers who manage [Prudential] and [the Bank] also will manage [MHC].  No assurances can be given that [MHC] will not take action which the minority shareholders believe to be contrary to their interests.  For example, [MHC] could revise the [the Bank's] dividend policy, *approve the implementation of stock benefit plans*, prevent a sale or merger transaction or defeat a candidate for [Prudential's] board of directors or other proposals put forth by minority shareholders.

(Prospectus 15 (emphasis added).)

In addition to disputing whether MHC may rightfully vote in favor of adoption of the stock plans, plaintiff contests whether the stock plans at issue in this case are actually necessary

---

[1] The plans at issue are the SRRP and the SOP.  These plans would be designed to attract and retain qualified personnel and to give management an interest in the success of the bank.  The plans would be funded at the maximum permitted by federal regulations:  for the SRRP, 4% of the amount of outstanding shares; for the SOP, 10% of the amount of outstanding shares.  (Prospectus 9-10, 87-88.)

[2] For a discussion of the prospectus language from which plaintiff draws the alleged promise and my conclusion that the prospectus does not, in fact, make an explicit, express promise that MHC will not vote on the stock plans, see *Stilwell Value Partners I, L.P. v. Prudential Mutual Holding Co.*, No. 06-4432, 2007 WL 2345281, at *2, 7 (E.D. Pa. Aug. 15, 2007).

to align the economic interests of officers and directors with the shareholders and help Prudential

attract and retain talented officers and employees.  MHC disputes this characterization.  (*See* Pl.'s

Facts 40-43; Def.'s Resp. to Pl.'s Facts ¶¶ 41-43; O'Donnell Dep. 229:4-230:9, 231:8-233:10,

Feb. 15, 2008.)  Plaintiff further asserts that the stock plans will increase costs and will dilute the

value of the shares held by the minority shareholders when allocations of stock are made under

the plans.  (Pl.'s Facts ¶ 23 (citing Prospectus 14, 17).)  MHC agrees that the prospectus

discloses that implementation of the stock plans will increase costs and that the stock plans may

be dilutive, but contests plaintiff's characterization that the cost will be borne by the minority

shareholders alone.  (Def.'s Resp. to Pl.'s Facts ¶ 23.)  Prudential's investment banker testified

simply that "the shareholders bear cost in the adoption of the plans," and not that they alone bear

the cost.  (Duke Dep. 33:3-6, Jan. 31, 2008.)


### 1.    Relevant Regulations

The Federal Deposit Insurance Corporation ("FDIC") is Prudential's primary regulator.

The FDIC regulations relevant to the stock plans at issue here state, in pertinent part:

> [N]o converted insured mutual state savings bank shall, for one year from the date
> of the conversion, implement a stock option plan or management or employee stock
> benefit plan, other than a tax-qualified employee stock ownership plan, unless each
> of the following requirements is met:
> . . .
> (3) In the case of a savings bank subsidiary of a mutual holding company, all such
> plans are approved by a majority of stockholders other than its parent mutual holding
> company prior to implementation at a duly called meeting of shareholders, either
> annual or special, to be held no sooner than six months following the stock
> issuance[.]

12 C.F.R. § 333.4(e) (2008).  The FDIC confirmed, in a letter dated July 6, 2005, that "[b]ased

on the information [Prudential] provided, it is the FDIC's view that the provisions of 12 C.F.R. §

333.4(e) would not apply to any employee stock benefit plans submitted for shareholder approval

more than one year after the effective date of the mutual-to-stock conversion of Prudential."

(Def.'s Mem. Ex. 7; *see also* Def.'s Ex. 15 (letter from FDIC responding to request to re-examine

its interpretation of the regulation and reaffirming its interpretation); Def.'s Ex. 16 (same).)

Citing the FDIC's letter, the Federal Reserve Board likewise advised that "the Federal Reserve

would not interpret 12 C.F.R. § 333.4(e) to apply to the approval of the Stock Benefit Plans that

will be submitted for shareholder approval" more than a year after the conversion.  (Def.'s Mem.

Ex. 8.)

      Before reorganizing, the Bank applied for and received conditional approval of its

conversion and reorganization plan from the Pennsylvania Department of Banking ("DOB").

(Pl.'s Mem. Ex. K.)  In conditionally approving the reorganization to a mutual holding company

structure, the DOB stated, among other things, that "[t]he application is approved conditioned

upon compliance with the relevant [Office of Thrift Supervision ("OTS")] regulations, consistent

with Section 115.1(f) of the [Pennsylvania] Banking Code."  (*Id.* at 3.)  The conditional approval

further provided, with respect to stock plans:

> The Department has reviewed the proposed Stock Option Plan ("SOP") and Stock
> Recognition and Retention Plan ("SRRP") and does not object to the acquisition of
> 10% and 4% of the total shares issued in the proposed transaction by the SOP and
> SRRP, respectively, consistent with 7 P.S. § 115.1(f) and 12 C.F.R. § 563b.500(a).

(*Id.* at 4.)  The OTS, which regulates all federal and many state-chartered thrift institutions, but

not state-chartered savings banks such as Prudential and the Bank, has issued regulations similar,

but not identical, to the FDIC regulations explained above.  The relevant OTS regulation states:

(a) You may implement a stock option plan or management or employee stock benefit plan within 12 months after your conversion, if you meet all of the following requirements.

. . .

(7) Your shareholders approve each plan by a majority of the total votes eligible to be cast at a duly called meeting before you establish or implement the plan. You may not hold this meeting until six months after your conversion.  If you are a subsidiary of a mutual holding company, a majority of the total votes eligible to be cast (other than your parent mutual holding company) must approve each plan before you may establish or implement the plan.

12 C.F.R. § 563b.500(a) (2007).  As explained in the opinion disposing of the defendants'

motion to dismiss, the OTS has interpreted the voting requirements contained in §

563b.500(a)(7) to apply to proposed management and employee stock benefit plans that are to be

implemented by subsidiary holding companies in a mutual holding company structure regardless

of the length of time that has elapsed after the public offering, meaning that the parent mutual

holding company would always be ineligible to vote on the issuance of a stock benefit plan.

*Stilwell*, 2007 WL 2345281, at *5.  As explained below, plaintiff argues that by referencing the

OTS regulation, the DOB letter requires MHC to abide by the OTS regulation that prohibits it

from participating in a vote to approve stock plans, even if that vote were held more than one

year from the date of the conversion.

## 2.      Proposed Plans and Voting

The stock plans were discussed by the directors at a Bank planning session on May 12,

2004 and at a Bank board meeting on June 8, 2004.  (Pl.'s Mem. Exs. E, F.)  At one or both of

these meetings, the directors discussed the permissible size of the plans and the fact that the plans

could not, pursuant to the relevant regulations, be put to a vote for at least six months after the

reorganization.  (*Id.*)  In these early discussions, the directors contemplated funding the plans at

the legal maximum.  (*Id.*)  The parties dispute whether, prior to the conversion, the directors

contemplated that a vote on the stock plan would be held during the first year after the

conversion.  (Pl.'s Facts ¶ 20; Def.'s Resp. to Pl.'s Facts ¶ 20.)

       In June 2005, plaintiff announced its intention to oppose the stock plans, and at least one

of the directors concluded that plaintiff would be able to block implementation of the plans if the

vote were held earlier than one year after the conversion.  (*See* Vento Dep. 169:3-8 ("Q. . . .

[W]hy didn't you put the plans up for a vote in the second six months from the IPO?  A.

Because we knew they would be voted down."), 171:9-17 ("[W]e realized we couldn't count the

MHC vote and we knew how much vote . . . [Stilwell] controlled of the . . . public

shareholder[s]. . . . [W]e knew we couldn't win it.").)

       On April 6, 2006, at a special meeting of the board of directors of Prudential, a resolution

stating that the stock plans be "approved and adopted subject to the requisite stockholders

approval" was unanimously accepted.  (Def.'s Mem. Ex. 2.)  In a press release issued the same

day, Prudential announced its intention to call a special shareholders meeting to vote on the

approval of the stock plans and, additionally, disclosed that it had received an opinion letter from

the FDIC that FDIC regulations would not prohibit MHC from voting on the stock plans one year

after the organization.  (Def.'s Mem. Ex. 3 (referring to Def.'s Mem. Ex. 7, the letter from the

FDIC quoted above).)  Prior to being referred to in Prudential's April 6, 2006 press release, the

existence of this letter had not been made known to the public.  (Pl.'s Facts ¶ 31; Def.'s Facts ¶

31.)

       At this point, plaintiff raised objections to MHC's participation in the vote:  "On April

8

13, 2006, the Stilwell Group filed a Form 14A with the SEC indicating its intention to solicit

proxies from other shareholders to oppose the Stock Plans at the special meeting.  The Stilwell

Group further advised that it would challenge the FDIC's advice, as described in the Prudential

press release, that MHC could participate in the vote on the Stock Plans." (Compl. ¶ 48.)[3]  Then,

at a meeting of the directors of Prudential and the Bank held on April 19, 2006, Prudential's

directors unanimously agreed to postpone the special meeting of shareholders scheduled for May

26, 2006 "to insure that no uncertainty exists with respect to the vote standard applicable to

approval of the plans." (Def.'s Mem. Ex. 4.)  Prudential then issued a press release announcing

the postponement.  (Def.'s Mem. Ex. 5.)  On September 22, 2006, the Deputy Secretary of the

Federal Reserve Board informed Prudential's counsel that the Board, like the FDIC, would not

oppose MHC's participation in a vote on the stock plans.  (Def.'s Mem. Ex. 8.)

Despite the fact that the directorates of Prudential and MHC overlap, there is no evidence

that the stock plans were ever discussed at any MHC board meeting.  (Vento Decl. ¶ 4.)

## C.    Procedural History

Plaintiff filed its Complaint in this court on October 4, 2006 against MHC, Prudential,

and the individual directors.  Plaintiff alleged that the anticipated actions of the defendants with

respect to the vote on the stock plans are contrary to certain representations defendants made in

an offering prospectus and in breach of defendants' fiduciary duties owed to plaintiff, a minority

---

[3] In its memorandum of law in support of its motion for summary judgment, MHC cites
to the Complaint in support of the proposition that Stilwell raised objections to MHC's
participation in the vote. (Def.'s Mem. 6.)  I assume, therefore, that MHC does not disagree with
the facts alleged in the quoted paragraph of the Complaint.

shareholder of Prudential.

On August 15, 2007, I granted in part defendants' motion to dismiss the Complaint. I granted the motion with respect to Count I (alleging promissory estoppel against MHC and Prudential), Count III (alleging unjust enrichment against MHC and the director defendants), and Count IV (seeking to enjoin all defendants from diluting the voting power of and disenfranchising the minority shareholders). I also granted defendants' motion to dismiss with respect to the portion of Count II alleging breach of fiduciary duty by the director defendants. Thus, the remaining claims, alleging that MHC breached the fiduciary duties owed by a majority shareholder to the minority shareholders, are as follows:

> 68.    MHC's participation in a shareholder vote on the Stock Plans will violate its fiduciary duty to [plaintiff]. Because MHC is controlled by the Controlling Directors, MHC labors under—and its fiduciary obligations are compromised by—the same self-interest which tars those Directors' conduct. Accordingly, MHC's participation in a shareholder vote which, as alleged above, violates the Director Defendants' fiduciary duties also violates MHC's fiduciary duties to [plaintiff].
> 69.    Moreover, MHC, at the time of the initial public offering, had the ability to control, and did control, the contents of the Prospectus. Thus, its shareholder rights are limited by the terms of the Prospectus. Because Prudential is bound, by the Prospectus's promises, to exclude MHC from any shareholder vote on the Stock Plans, MHC's participation in such a vote would cause Prudential to breach its promises and effectively disenfranchise [plaintiff] (and all other minority shareholders). MHC's knowing participation in conduct that will breach Prudential's obligations to [plaintiff] and subvert [plaintiff's] voting rights constitutes a breach of MHC's fiduciary duties to [plaintiff].

(Compl. ¶¶ 68-69.) Plaintiff and the remaining defendant, MHC, have now each moved for summary judgment on these remaining claims.

## II.    Standard

A motion for summary judgment will be granted only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party thus bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the nonmoving party avoids summary judgment by presenting "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)).  Where the nonmoving party bears the burden of persuasion at trial, it meets its burden at the summary judgment stage by supporting each essential element of its claim with concrete evidence "from which a rational person could conclude that [its] position . . . on the disputed issue is correct."  *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (quotation marks and citations omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed."  *Anderson*, 477 U.S. at 255.  Furthermore, "all justifiable inferences are to be drawn in [the nonmovant's] favor."  *Id.*  "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."  *Ideal Dairy Farms*, 90 F.3d at 744 (quotation marks and citations

omitted).  However, "an inference based upon a speculation or conjecture does not create a

material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied*

*Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

Where, as here, the parties have filed cross-motions for summary judgment, "Rule 56(c)

does not mean that the case will necessarily be resolved at the summary judgment stage . . . .

Each party must still establish that no genuine issue of material fact exists and that it is entitled to

judgment as a matter of law." *Atl. Used Auto Parts v. City of Phila.*, 957 F. Supp. 622, 626 (E.D.

Pa. 1997).


**III.    Discussion**

In my opinion disposing of Prudential's motion to dismiss, I set out Pennsylvania's law

regarding the fiduciary duties of majority shareholders:

> The Pennsylvania Supreme Court has stated:
>> It has long been recognized that majority shareholders have a duty to
>> protect the interests of the minority[.] . . . "[M]ajority stockholders
>> occupy a quasi-fiduciary relation toward the minority which prevents
>> them from using their power in such a way as to exclude the minority
>> from their proper share of the benefits accruing from the enterprise."
> *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa. 1983) (emphasis omitted); *see
> also Tyler v. O'Neill*, 994 F. Supp. 603, 612 (E.D. Pa. 1998) (stating that "under
> Pennsylvania law, majority shareholders or group of shareholders who combine to form
> a majority, are fiduciaries, and they may not use their voting power to benefit
> themselves personally at the expense of the minority"). In explaining this duty, the
> Pennsylvania Supreme Court has noted, "In the broader sense the holder of the
> majority of the stock owes to the other stockholders and the corporation the duty to
> exercise good faith, care, and diligence to conserve the property of the corporation
> and to protect the interests of the minority stockholders . . . [.]" *Weisbecker v.
> Hosiery Patents, Inc.*, 51 A.2d 811, 814 (Pa. 1947); *see also Bohler-Uddeholm Am.,
> Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 100-01 (3d Cir. 2001) ("A shareholder in
> such a position is under close scrutiny, and is expected to conform to the highest
> standards of conduct."). However, this principle "does not mean, of course, that

majority shareholders may never act in their own interest, but when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation." *Ferber*, 469 A.2d at 1050 (citing *Weisbecker*, 51 A.2d at 814, 817).

The test of liability for breach of fiduciary duty is whether the officer, director, or shareholder was unjustly enriched by the challenged actions. *Tyler*, 994 F. Supp. at 612. The Third Circuit has had the opportunity to address this issue finding that "Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when the fiduciary acts to benefit himself while in the fiduciary role." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 101 (citing *Ruggieri v. West Forum Corp.*, 282 A.2d 304, 307 (Pa. 1971)).

*Stilwell*, 2007 WL 2345281, at *8 (some internal citations omitted).

At the motion to dismiss stage, two then-unresolved issues were apparent: First "it [wa]s somewhat unclear which actions plaintiff claims were perpetrated by director defendants and which by MHC," and so I assumed for purposes of the motion "that MHC was involved in the decision to postpone voting on the stock plans." *Id.* at *8 n.6. Second, "[b]ecause MHC stands in a fiduciary relationship to plaintiff, and MHC's participation in the vote will benefit MHC by allowing it to control the outcome of the vote, MHC bears the burden of proving that its participation in a vote on the stock plans will not unjustly enrich MHC and that it will be fair and not fraudulent." Now, at the summary judgment stage, I conclude that there is no evidence that MHC was involved in the decision to postpone the vote, and so I will grant MHC's motion for summary judgment as to that issue. I will, however, deny both parties' motions for summary judgment with respect to the question whether MHC's anticipated vote to adopt the stock plans would breach its fiduciary duties to the minority shareholders.

## A.    Decision to Postpone the Shareholder Vote on the Stock Plans

Plaintiff alleges that MHC violated its fiduciary duties by postponing—or by acquiescing

in the postponement of—the vote on the stock plans.  For the following reasons, I will grant

MHC's motion for summary judgment as to this claim.

If MHC was not actually involved in the decision to postpone voting on the stock plans, it

cannot have breached its fiduciary duties with respect to the timing of the vote on the stock plans.

A corporation acts through its board of directors.  *See* 15 Pa. Cons. Stat. § 1721 ("Unless

otherwise provided by statute or in a bylaw adopted by the shareholders, all powers [of the

corporation] shall be exercised by or under the authority of, and the business and affairs of every

business corporation shall be managed under the direction of, a board of directors.").  Such acts

take place upon a vote of the directors at a meeting of the board.  *See id.* § 1727 ("Unless

otherwise provided in the bylaws, a majority of the directors in office of a business corporation

shall be necessary to constitute a quorum for the transaction of business, and the acts of a

majority of the directors present and voting at a meeting at which a quorum is present shall be the

acts of the board of directors."); *Stone v. Am. Lacquer Solvents Co.*, 345 A.2d 174, 176 (Pa.

1975) ("As a general rule the directors of a corporation may bind a corporation only when they

act at a legal meeting of the board.").  In addition to its other functions, the board schedules

special meetings of shareholders at which shareholders vote.  *See* 15 Pa. Cons. Stat. § 1755

("Special meetings of the shareholders may be called at any time:  (1) by the board of directors;

(2) unless otherwise provided in the articles, by shareholders entitled to cast at least 20% of the

votes that all shareholders are entitled to cast at the particular meeting; or (3) by such officers or

other persons as may be provided in the bylaws.").

The decision to postpone voting on the stock plans in this case (i.e., the decision to

postpone the special meeting of shareholders at which the vote would take place) was made by

the board of directors of Prudential.  (*See* Def.'s Mem. Ex. 2 (minutes of special meeting of the

Prudential board at which a special meeting of shareholders was scheduled for May 26, 2006, for

the purpose of a vote on the stock plans); *id.* Ex. 4 (minutes of special meeting of the Prudential

and Prudential Savings Bank boards at which the special meeting of shareholders scheduled for

May 26, 2006 was postponed).)  Thus, in accordance with Pennsylvania corporation law, the

decision was made by Prudential.

      The directors who sit on MHC's board are also the directors of Prudential and the Bank.

(Pl.'s Facts ¶¶ 3-4.)  This does not mean, however, that the directors were acting as the MHC

board when voting on Prudential resolutions at Prudential board meetings.  "[I]t is entirely

appropriate for directors of a parent corporation to serve as directors of its subsidiary."  *United

States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56,

57 (2d Cir. 1988)).  A well-established principle of corporation law recognizes "that directors

and officers holding positions with a parent and its subsidiary can and do 'change hats' to

represent the two corporations separately, despite their common ownership."  *Id.* (quoting *Lusk v.

Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)).  Courts "generally presume that the

directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the

subsidiary."  *Id.* (internal quotations marks omitted).

      Plaintiff counters that the presumption that the directors were wearing only their

Prudential hats when postponing the meeting is unwarranted in this case.  Plaintiff asserts:

> Only by ignoring the record, the fundamental nature of Prudential's mutual holding
> company structure, and defendant's own self-serving conduct, is MHC able to proffer
> [its argument that MHC did not participate in the decision to postpone voting on the
> stock plans].  The record shows a clear course of conduct in which MHC, through its
> directors, was directly involved in the decision to postpone the voting on the stock

15

plans.

(Pl.'s Resp. Opp'n Def.'s Mem. 5.)

Plaintiff first argues that, "as a general matter," the decision to postpone the vote on the stock plans was made by directors who sit on both the Prudential board and the MHC board. (*Id.*) As explained above, however, the presence of overlapping directorates is insufficient to suggest that at Prudential board meetings the directors were acting, in fact, for MHC. *See Bestfoods*, 524 U.S. at 69 (holding, with respect to CERCLA liability, that "it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility"). Furthermore, plaintiff argues that the acts taken by the directors at a Prudential board meeting should be attributed to MHC because MHC "is inextricably involved in the actions taken by" Prudential as a result of MHC being Prudential's majority shareholder and "the mutual holding company structure is predicated on the mutual holding company (MHC) controlling the decisions of the public company." (Pl.'s Resp. 5-6.)   While it is, of course, true that the mutual holding company structure was designed to allow the holding company to control the acts of the public company, *see* Am.'s Cmty. Bankers, *Today's Mutual Community Banks* 4-5 (2007) (explaining the form and benefits of the mutual holding company structure), this fact does not imply that the directors were wearing their MHC hats, rather than their Prudential hats, when they voted at a Prudential board meeting to postpone the vote on the stock plans.

Second, plaintiff asserts on the basis of deposition testimony that "the directors themselves testified that they saw no difference in acting for [Prudential] as [o]pposed to MHC." (Pl.'s Resp. 6.)  Whether some of the directors saw no difference between acting for Prudential and acting for MHC is irrelevant in this case, however, when the only defendant remaining is

16

MHC, the corporate entity, and the record reflects that the relevant votes were on behalf of

Prudential.  Three directors testified that they perceived no distinction between acting for one

corporation and acting for another.[4]  Not all the directors took this view, however.  Director

Corrato explained that the MHC directors and Prudential directors, although the same

individuals, act only in their capacity as Prudential directors when scheduling Prudential

shareholder votes.[5]  Director Vento stated more generally that the boards act separately:

> Often, Prudential's board and the Bank's board hold joint meetings that do not

---

[4] Director Balka answered "[n]ot really" to the question whether there is "a difference in your mind between you acting for Prudential Mutual Holding Company and your acting for Prudential Bancorp."  (Balka Dep. 28:3-7.)  Director Fanelli also answered that he "do[esn't] see any difference" "between [his] being a director of Prudential Bancorp and [his] being a director of Prudential Mutual Holding Company in terms of what [his] duties are."  (Fanelli Dep. 29:4-10.)  Director Judge, too, did not "see any difference really" "between [his] acting for Prudential Mutual Holding Company and [his] acting for Prudential Bancorp as a director."  (Judge Dep. 20:21-21:3.)

[5] Director Corrato testified as follows:

The MHC has no power or control over when the plans or anything is really put to a vote.  They're a shareholder.
Q.    Who decides that?
A.    What do you mean "who decides that"?
Q.    Who decides when to put something on a Bancorp agenda?
A.    The directors of the Bancorp.
Q.    But, Mr. Corrato, those are the exact same directors who sit on MHC, aren't they?
A.    Yes, they are.
Q.    So what's the difference?
A.    Well, they're acting in the capacity of Bancorp.
Q.    The same—
A.    There are times when they're acting in the capacity of the Bank, they're acting in the capacity of the Bancorp, and they're acting in the capacity of the MHC.
Q.    Same people different hats.
A.    Yes.

(Corrato Dep. 140:1-141:3.)

> include MHC business; MHC does not act in any way at those meetings.
> Occasionally, the three boards (including MHC's board) hold joint meetings that
> include MHC business.  In those circumstances, MHC's directors act for MHC
> through separate resolutions, clearly identified as resolutions of the MHC board.

(Vento Decl. ¶ 2.)  Similarly, director Mulcahy affirmed that he "consider[s] there to be a

difference between [his] acting as a director for the Mutual Holding Company and [his] acting as

a director for [Prudential]."  (Mulcahy Dep. 12:23-13:4.)  The corporate records of the meeting

on April 19, 2006, when the decision to postpone the vote was made, clearly show that it was a

meeting of the Prudential board.  MHC did not have a board meeting at that time and never had a

board meeting concerning the timing of the vote on the stock plans.  The record is not sufficient

for a reasonable jury to conclude that the action clearly taken at a Prudential board

meeting—rather than at a MHC board meeting—was the corporate act of MHC.

Third, plaintiff argues that the decision to postpone the vote was made informally by the

directors in 2005 and that "MHC cannot disclaim responsibility for the actions of its directors."

(Pl.'s Resp. 7.)  However, the fact that the individual directors may have agreed to postpone the

shareholder vote on the stock plans prior to the April 19, 2006 meeting of the boards of

Prudential and the Bank does not establish that the corporate act postponing the meeting was an

act of MHC.  As noted above, a corporation acts only through its board of directors at a meeting

of its directors.  Thus, even if the directors discussed, outside of the board meeting, postponing

the shareholder meeting at which the vote on the stock plans would take place, the corporate act

occurred on April 19, 2006 at a meeting of the boards of Prudential and the Bank.  There is no

evidence that postponement of the shareholder meeting at which the vote on the stock plans

would take place occurred during any MHC board meetings.  *See* Vento Decl. ¶ 4 ("The MHC

board has never even discussed the stock benefit plans at an MHC board meeting.").

      Fourth, plaintiff argues that even if MHC did not actively participate in the decision to postpone the vote, it breached its fiduciary duty to the minority shareholders by acquiescing in the decision to postpone the vote,. (Pl.'s Resp. 7.)  Again, however, there is no evidence that MHC acquiesced in the decision to postpone the vote.  Because a corporation can only make decisions through votes of its directors (i.e., a corporation cannot passively cause a corporate act to occur), it is difficult to conceive how a corporation can acquiesce under the circumstances of the instant case.  The cases plaintiff cites in support of its acquiescence argument are distinguishable from the situation before me.  First, plaintiff directs the court to *Flynn v. Bass Bros. Enters., Inc.*, 744 F.2d 978, 984 (3d Cir. 1984), in which the Third Circuit addressed the duty of a majority shareholder to make disclosures pursuant to a tender offer.  Under the circumstances of that case, "federal securities law requires the disclosure of any 'material fact' in connection with the purchase or sale of a security under rule 10b-5 or the tendering of an offer under section 14(e)."  *Id.*  In that context, the court noted "that a policy of conscious ignorance cannot eliminate the fiduciary duty a majority shareholder owes to the minority shareholders." *Id.* at 984 n.5.  In the instant case, however, the plaintiff has not pointed to a specific duty of MHC, akin to the duty to disclose material information pursuant to a tender offer, which MHC consciously ignored.  Second, plaintiff points to *In re Reading Co.*, 711 F.2d 509, 517 (3d Cir. 1983), for the proposition that a majority shareholder's "action or inaction" may breach the fiduciary duty owed to minority shareholders.  While true, the majority shareholder's inaction in *Reading* was the "continued adherence to . . . policies"—namely, its "car leasing policy, its refusal to pay dividends, and its continued reinvestment of earnings in new equipment"—that

19

were allegedly "improper given Reading's departure from the railroad business." *Id.* This inaction by failure to adopt new corporate policies is a different sort of inaction from that alleged by plaintiff here, which involved the failure to intervene in a separate corporation's decision making. No policy of MHC was implicated.[6] Finally, plaintiff cites *Miller v. Blatstein (In re Main, Inc.)*, No. 98-5947, 1999 WL 424296, at *18-20 (E.D. Pa. June 23, 1999), for the proposition that "a director must 'take positive steps to correct an illegal corporate action,' and may be liable for 'acquiescing' in another director's self-dealing transaction." (Pl.'s Resp. 8.) The part of *Miller* on which plaintiff relies, however, deals with the liability of an individual director, and not with the liability of the corporation. *Miller* does not address the issue in this case. In sum, plaintiff's argument that MHC acted wrongfully by acquiescing in Prudential's decision to postpone the vote on the stock plans is not persuasive.

Plaintiff has made four arguments in support of its assertion that MHC postponed the vote on the stock plans. Each of these arguments, and the evidence cited by plaintiff in support thereof, however, is insufficient for a reasonable jury to find that MHC, as a corporate entity distinct from its individual directors, took any action with respect to the timing of the vote.[7]

---

[6] The court in *Reading* reasoned that "[s]elf-dealing occurs when the majority shareholders *cause* the dominated corporation to act in such a way that the majority shareholders receive something from the corporation to the exclusion and detriment of the minority shareholders." *Id.* at 518 (emphasis added). As noted repeatedly, plaintiff has produced no evidence that MHC, as a corporate entity, caused Prudential to postpone the shareholder meeting at which the stock plans vote would occur.

[7] Relying on 15 Pa. Cons. Stat. § 1717, which provides that "[t]he duty of the board of directors, committees of the board and individual directors under section 1712 (relating to standard of care and justifiable reliance) is solely to the business corporation . . . and may not be enforced directly by a shareholder," I dismissed the portions of Count II asserting claims for breach of fiduciary duty by the directors. *See Stilwell*, 2007 WL 2345281, at *9. As the claims against the directors have already been dismissed, I do not here address plaintiff's claims

20

MHC, as a shareholder of Prudential, could be liable for a breach of a fiduciary dury resulting from the postponement of the vote (if such breach occurred) only if I were to pierce the corporate veil and hold MHC responsible for the acts of Prudential.  Although not alleged in the Complaint, plaintiff appears to be arguing that the corporate veil should be pierced—and MHC should be held liable for allegedly wrongful acts of Prudential—because Prudential was the instrumentality of MHC.  Under the instrumentality, or alter ego, doctrine,[8] courts may pierce the corporate veil "whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests."  *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978).  To recover under this theory, a plaintiff must allege:

> (1) That one corporation controlled another corporation to such a degree that the controlled corporation is a mere instrumentality;
> (2) That the controlling corporation is perpetrating a fraud or wrong through the controlled corporation (e.g., torts, violation of a statute, or stripping a subsidiary of its assets); and
> (3) An unjust loss or injury to the claimant, such as insolvency of a controlled corporation.

*May v. Club Med Sales, Inc.*, 832 F. Supp. 937, 938-39 (E.D. Pa. 1993) (citation omitted).

To establish that one corporation is the "mere instrumentality" of another, a plaintiff must show "that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham."  *Culbreath v. Amosa, Ltd.*, 898 F.2d 13, 14 (3d Cir. 1990).  Pennsylvania courts consider

---

regarding the directors' alleged conflict of interest.

   [8] "Although the tests employed to determine when circumstances justifying 'veil-piercing' exist are variously referred to as the 'alter ego,' 'instrumentality,' or 'identity' doctrines, the formulations are generally similar, and courts rarely distinguish them."  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 n.2 (3d Cir. 2001) (citation omitted).

the following non-exhaustive list of factors when determining whether a parent and a subsidiary are truly separate entities:

> [F]ailure to observe corporate formalities; non-payment of dividends; insolvency of [the] debtor corporation; siphoning [of] funds . . . by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization.

*E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 334 n.7 (3d Cir. 2000) (citations omitted). "Piercing the corporate veil is . . . an extraordinary remedy preserved for cases involving exceptional circumstances." *Vill. at Camelback Prop. Owners Ass'n v. Carr*, 538 A.2d 528, 533 (Pa. Super. Ct. 1988).  Plaintiff has not offered any evidence sufficient to proceed with a claim to pierce the corporate veil.[9]

Because there is no evidence that MHC participated in the decision to postpone the shareholder vote and there is no basis for piercing the corporate veil, I will deny plaintiff's motion for summary judgment and grant MHC's motion for summary judgment as to this claim.

### B.    MHC's Vote on the Stock Plans

Plaintiff alleges not only that MHC breached its fiduciary duties by participating in the decision to postpone the shareholder vote on the stock plans, but also that MHC will breach its

---

[9] Because MHC did not participate in the decision to postpone the vote on the stock plans, it cannot be said to have interfered with the minority shareholders' voting rights, as plaintiff argues it did (Pl.'s Mem. 18-20), or "abandoned its intention to submit the matter to a vote in the first year following the conversion" (*id.* at 21).

Additionally, plaintiff makes the argument that, although MHC is not prohibited by FDIC regulations from voting on the stock plans more than one year after conversion to the mutual holding company structure, this fact alone does not establish that MHC did not violate its fiduciary duties.  (Pl.'s Mem. 13.)  As I have held that MHC was not involved in the decision to postpone the vote on the stock plans, this argument is moot.

fiduciary duties by casting its majority vote in favor of adoption of the stock plans.  Plaintiff thus

asks the court to enjoin MHC from participating in any vote held to approve the stock plans.  For

the following reasons, I will deny both parties' summary judgment motions as to this claim.

MHC's arguments in support of its motion for summary judgment center on its assertion

that the relevant regulations—those promulgated by the FDIC—do not prevent MHC from voting

on the stock benefit plans after one year from the date of the conversion.  Plaintiff does not

dispute that the FDIC regulations allow the vote to take place.  (*See* Pl.'s Resp. 12

(acknowledging that "the FDIC does not regulate MHC participation after one year").)  However,

the real issue on this claim is not whether MHC would be in compliance with the relevant

regulations if it voted on the stock plans, but whether voting to approve the stock plans would

constitute a breach of its fiduciary duties to the minority shareholders.  Plaintiff correctly argues

that MHC's compliance with applicable regulations does not compel the conclusion that MHC's

conduct is in line with its fiduciary duties.  *Cf. Coleman v. Taub*, 638 F.2d 628, 635 (3d Cir.

1981) (holding with respect to a freeze-out merger involving a majority shareholder that "in

every merger under Delaware law, . . . the essential consideration must be the fiduciary duty of

fairness and good faith owed by the majority to the minority stockholders" and that this duty

arises independently of statutory obligations).  Therefore, I will not grant MHC's motion for

summary judgment on this basis.  Resolution of the summary judgment motions requires analysis

of MHC's fiduciary duties.

Pursuant to general corporation law, in upholding its fiduciary duties a majority

shareholder of a corporation may act in its own best interest only when its best interest is also the

best interest of the corporation.  *Ferber*, 469 A.2d at 1050.  Often, a corporation's best interest

equates with the maximization of its share price.  In Pennsylvania, however, the best interest of a corporation is defined more broadly, to reflect the policy that other goals and constituencies be taken into account.  *Cf.* 15 Pa. Cons. Stat. § 1715(a)(1) (providing that directors acting in a corporation's best interest may "consider to the extent they deem appropriate . . . [t]he effects of any action upon any or all groups affected by such action, including shareholders, employees, suppliers, customers and creditors of the corporation, and upon communities in which offices or other establishments of the corporation are located"); *id.* § 1715(b) (providing that the board "shall not be required, in considering the best interests of the corporation or the effects of any action, to regard any corporate interest or the interests of any particular group affected by such action as a dominant or controlling interest or factor").[10]  Thus, a minority-

---

[10] The cited provisions of the Business Corporation Law provide in full:

      (a)      General rule.—In discharging the duties of their respective positions, the board of directors, committees of the board and individual directors of a business corporation may, in considering the best interests of the corporation, consider to the extent they deem appropriate:

      (1)      The effects of any action upon any or all groups affected by such action, including shareholders, employees, suppliers, customers and creditors of the corporation, and upon communities in which offices or other establishments of the corporation are located.

      (2)      The short-term and long-term interests of the corporation, including benefits that may accrue to the corporation from its long-term plans and the possibility that these interests may be best served by the continued independence of the corporation.

      (3)      The resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation.

      (4)      All other pertinent factors.

      (b)      Consideration of interests and factors.—The board of directors, committees of the board and individual directors shall not be required, in considering the best interests of the corporation or the effects of any action, to regard any corporate interest or the interests of any particular group affected by such action as a dominant or controlling interest or factor. The consideration of interests and factors in the manner described in this subsection and in subsection (a) shall not constitute

shareholder plaintiff cannot necessarily prevail on a breach-of-fiduciary-duty claim against the

majority shareholder simply by suggesting that the majority shareholder's anticipated action will

decrease the value of the minority shareholders' stock.

In the instant case, then, plaintiff's motion for summary judgment cannot be granted on

the basis of plaintiff's assertion that MHC's anticipated vote to approve the stock plans may have

the effect of diluting the value of Prudential stock and therefore MHC's anticipated vote is not in

the best interest of Prudential.  The best-interest-of-the-corporation analysis is broader, to take

into account the factors and interests identified in 15 Pa. Cons. Stat. § 1715(a).  In this case, that

analysis includes looking at the interests of the minority shareholders, "employees, suppliers,

customers and creditors" of Prudential, and "communities in which offices or other

establishments" of Prudential are located.  The analysis may also take into account the goals of

---

a violation of section 1712 (relating to standard of care and justifiable reliance).

15 Pa. Cons. Stat. § 1715(a)-(b).

Pennsylvania, in 1983, was the first state to enact such a "constituency statute."  Robert Goodyear Murray, Comment, *Money Talks, Constituents Walk: Pennsylvania's Corporate Constituency Statute Can Maximize Shareholders' Wealth*, 48 Buff. L. Rev. 629, 629 (2000).  It was adopted with "an anti-takeover motive," to protect corporations from hostile takeovers by allowing directors to evaluate factors other than share price. *Id.* at 629-31.  In the context of hostile takeovers, constituency statutes "have broadened the business judgment rule giving the board authority to consider a broad range of non-shareholder constituencies in determining what action is in the best interest of the corporation."  *Id.* at 641.

The anti-takeover rationale behind Pennsylvania's constituency statute is analogous to the goal of the mutual holding company structure—maintaining a viable, locally-owned community bank insulated from takeover by a public shareholder, *see infra* note 11.  Thus, although Pennsylvania's constituency statute applies explicitly only to directors' actions with respect to the corporation they manage, the policy goals behind the statute support use of its broader notion of the best interest of a corporation in this context.

the mutual holding company structure.[11]  *See* 15 Pa. Cons. Stat. § 1715(a)(4) (permitting

consideration of "[a]ll other pertinent factors").

The parties have not addressed the effect of the proposed stock plans on the employees,

customers, or communities of Prudential.  Therefore, I cannot on the basis of the record before

me determine whether MHC's anticipated vote to approve the stock plans would be in the best

interest of Prudential and its stakeholders, making its anticipated vote fair to the minority

shareholders and not a breach of its fiduciary duties owed to the minority shareholders.

Nevertheless, I will address many of plaintiff's arguments in support of its motion.

Plaintiff first argues that MHC's anticipated vote to adopt the stock plans would not be fair to the

minority shareholders—and, presumably, would not be in the best interest of

Prudential—because there is no evidence that the directors even considered using a committee of

disinterested persons to represent the interests of the minority shareholders when designing the

plan and its administration.  (Pl.'s Mem. 15.)  MHC dismisses this argument by asserting that the

remaining claim "concerns only MHC's *participation in the vote* on the plans and is not about

the substance of the stock plans, the administration of the plans, or awards under the plans."

(Def.'s Resp. Opp'n Pl.'s Mem. 10.)  MHC cites no law in support of its assertion that plaintiff's

---

[11] The mutual holding company structure is predicated on the directors of the subsidiary bank being identical to the directors of its majority shareholder.  Mutual holding companies "ha[ve] become popular for those mutual managers and boards of directors that want to retain the independence of being a mutual, but also want the flexibility to raise capital for growth."  Am.'s Cmty. Bankers, *supra*, at 4.  In a mutual holding company structure, "[t]he members of the board of directors or trustees are not subject to the pressures of stockholders who are only interested in maximizing shareholder value, but instead maintain their focus on preserving a healthy, viable mutual community bank that serves the community."  *Id.* at 6.  Thus, the raison d'être for a mutual holding company structure is to guarantee that the majority shareholder—i.e., the mutual holding company, controls shareholder votes.

arguments about the substance of the plans "are beside the point" (*id.* at 11), and I disagree with

MHC's assertion.  Because the issue is whether MHC's anticipated vote to adopt the stock

plans—and the plans' subsequent adoption—would be in the best interest of Prudential and not a

breach of MHC's fiduciary duties to the minority shareholders, the substance of the plans is

relevant.  I am also unpersuaded, however, by plaintiff's allegation that an independent

committee to negotiate on behalf of the minority shareholders is required.  Plaintiff supports its

argument with three cases, none of which involves a Pennsylvania corporation, a mutual holding

company structure, or the adoption of stock plans.  *See Weinberger v. UOP, Inc.*, 457 A.2d 701

(Del. 1983) (involving a cash-out merger of Delaware corporations); *Strassburger v. Early*, 752

A.2d 557 (Del. Ch. 2000) (involving a stock repurchase by a Delaware corporation that had the

effect of creating a majority shareholder); *In re FLS Holdings, Inc. S'holders Litig.*, No. 12,623,

1993 WL 104562 (Del. Ch. Apr. 21, 1993), *aff'd sub nom Sullivan Money Mgmt., Inc. v. FLS

Holdings, Inc.*, 628 A.2d 84 (Del. 1993) (involving a cash-out merger of Delaware corporations).

Therefore, I will not grant either party's motion for summary judgment based on this issue.

Plaintiff further argues that adoption of the stock plans would not be in the best interest of

Prudential because "the plans were structured to allow for the maximum amount of benefits for

the directors without any discussion of whether they would satisfy the stated business purposes of

retention and attracting."  (Pl.'s Mem. 16.)  Again, MHC does not substantively address this

argument because of its position that the substance of the plans is irrelevant.  Nevertheless, I

cannot grant plaintiff's motion for summary judgment on this basis because plaintiff has failed to

establish an absence of genuine issues of material fact as to whether the stock plans truly have no

business purpose.  Plaintiff points to directors' and officers' testimony that the plans were not

27

necessary for them to join or remain with the company, for them to attract or retain employees, for them to align their interests with the interests of the minority shareholders, or for them to do a better job than they have been doing.  (Pl.'s Mem. 16-17.)  MHC, however, makes the valid point that the absence of any director or officer threatening to quit if the stock plans are not adopted, and the absence of any director's or officer's testimony that the stock plans are necessary for the performance of his duties, does not necessarily prove that the stock plans are not useful for the purposes of attracting and retaining talent.  (Def.'s Resp. to Pl.'s Facts ¶¶ 41, 43.)  Furthermore, MHC points to deposition testimony supporting the proposition that the stock plans will be helpful in attracting and retaining talented employees.  (*Id.* ¶ 42.)  Finally, MHC's expert testified to the general utility of stock plans in enabling companies to compete for talented employees and in aligning management and shareholder interests.  (O'Donnell Dep. 229:4-230:9, 231:8-233:10.)  This varied testimony about the effect of Prudential's proposed stock plans precludes my granting, with respect to this issue, plaintiff's motion for summary judgment.

Plaintiff argues, in addition, that "[t]he fact that MHC gamed the timing of that vote renders that benefit unjust."  (Pl.'s Mem. 23; *see also id.* at 17.)  However, as explained above, there is no evidence that MHC—as a corporate entity distinct from its individual directors—"gamed the timing of the vote."  And the individual directors are no longer parties to this lawsuit.  Therefore, this is not a ground on which summary judgment can be granted in favor of plaintiff.

Plaintiff next argues that MHC's anticipated vote on the stock plans would not be in the best interest of the corporation because implementation of the stock plans would dilute the value of the minority shareholders' stock.  Plaintiff asserts that because MHC did not pay for the stock it holds, dilution of Prudential stock potentially caused by implementation of the stock plans

28

would impact the minority shareholders alone.  (Pl.'s Mem. 23-24.)  It is true that a majority

shareholder might unjustly benefit, at the expense of minority shareholders, from dilution of a

stock's value.  *See Provident Nat'l Bank v. United States*, 436 F. Supp. 587, 589 (E.D. Pa. 1977)

("Since the enhanced value of the 2196 shares of preferred stock decreased the value of the non-

voting Class A Common Stock held by other shareholders, a disgruntled minority shareholder

would have a cause of action in the Pennsylvania courts to redress his loss.").  In this case,

however, it is not clear whether the stock value will actually be diluted.  MHC asserts that there

will be no dilution if the stock plans are funded by open-market purchases instead of by issuing

new shares and that, even if the stock plans are funded with newly issued shares, both MHC's

and the minority shareholders' shares would be diluted equally.[12]  (Def.'s Resp. 17-18.)  Plaintiff

has not come forward with evidence showing that the stock held by the minority shareholders

would actually be diluted upon adoption of the stock plans or that the majority shareholders

would be financially harmed by dilution in a way that MHC would not be.  Therefore, plaintiff's

motion for summary judgment cannot be granted on this basis.

Finally, plaintiff argues that MHC's participation in the vote on the stock plans will

violate a condition imposed by the DOB.  (Pl.'s Mem. 24.)  In conditionally approving the

reorganization to a mutual holding company structure, the DOB stated with respect to stock

plans:

> The Department has reviewed the proposed Stock Option Plan ("SOP") and Stock
> Recognition and Retention Plan ("SRRP") and does not object to the acquisition of

---

[12] MHC also asserts that "the prospectus specifically warned about the possibility of dilution due to the stock plans, and thus it is hard to imagine how the possibility of dilution could contribute to a breach of fiduciary duty."  (Def.'s Resp. 17.)  MHC has cited no law in support of this proposition.

10% and 4% of the total shares issued in the proposed transaction by the SOP and
SRRP, respectively, consistent with 7 P.S. § 115.1(f) and 12 C.F.R. § 563b.500(a).

(Pl.'s Mem. Ex. K, at 4.)  Plaintiff claims that because the cited OTS regulation, 12 C.F.R. §

563b.500(a), precludes regulated holding companies from ever voting on stock plans (regardless

of whether a year has passed since the initial public offering), the OTS regulation binds MHC.

Therefore, plaintiff claims, if MHC were to vote on the stock plans, "MHC would breach its

fiduciary duties to the minority shareholders because it would be causing an act which would

subject [Prudential] to regulatory action by the Department."  (Pl.'s Mem. 25.)  MHC argues in

reply that the DOB's "specific and limited reference to the OTS size limitations cannot possibly

be read as a requirement that Prudential or the Bank comply, in other respects, with OTS

regulations," when the FDIC's regulations are to the contrary.  (Def.'s Resp. 15.)  In support of

its position, MHC refers to a letter dated December 13, 2007, in which plaintiff's counsel asked

the DOB to "determine if [Prudential's] stated intent to adopt a stock plan by vote of the mutual

holding company violates the condition found on page 4 of the Conditional Approval."  (Def.'s

Resp. Ex. 1, at 3-4.)  Plaintiff's counsel further requested that "[i]f, upon review, the [DOB]

concludes that such a vote by the mutual holding company would violate the Conditional

Approval," the DOB would "so advise [Prudential] and prohibit it from so acting."  (*Id.* at 4.)

MHC asserts that the DOB has not so advised, but there is no evidence in the record of any

response from the DOB to the letter.

The language in the conditional approval is at best ambiguous.  The FDIC is the Bank's

primary banking regulator, and the FDIC has announced that the holding company may vote on

adoption of stock plans when the election is held more than one year after the conversion.  I, like

30

MHC, am wary that the DOB would "attempt to turn that relationship upside down in a passing reference in one letter." (Def.'s Resp. 15.) Therefore, I will not grant plaintiff's motion for summary judgment on the basis of this argument.

In sum, MHC's anticipated vote to approve the stock plans must be in the best interest of Prudential, making the vote fair to the minority shareholders and not a breach of MHC's fiduciary duties to Prudential's minority shareholders. Pennsylvania's constituency statute, 15 Pa. Cons. Stat. § 1715, evidences a policy of interpreting the best interest of a corporation broadly. Thus, in analyzing whether MHC's anticipated vote is in the best interest of Prudential, I will take into account multiple factors and interests, including Prudential's customers, officers and employees, and community, as well as the goals of the mutual holding company structure. Neither plaintiff nor MHC has demonstrated that, under this standard, there are no genuine issues of material fact and the party's position is correct as a matter of law. Therefore, I will deny both parties' motions for summary judgment as to this claim.

IV.    **Conclusion**

For the reasons explained above, I will grant MHC's motion for summary judgment and deny plaintiff's motion for summary judgment with respect to the question whether MHC breached its fiduciary duties to the minority shareholders by participating or acquiescing in the decision to postpone the shareholder vote on the adoption of the stock plans. I will deny both parties' motions for summary judgment on the question whether MHC should be enjoined from participating in the shareholder vote on the adoption of the stock plans.

An appropriate order follows.

31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STILWELL VALUE PARTNERS I, L.P., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-4432 |
| | : | |
| PRUDENTIAL MUTUAL HOLDING CO., | : | |
| Defendant. | : | |
| | : | |

**ORDER**

**AND NOW**, this _____ day of April 2008, upon consideration of the motions for summary judgment of plaintiff Stilwell Value Partners I, L.P. (Doc. No. 59) and defendant Prudential Mutual Holding Co. (Doc. No. 58), as well as plaintiff's and defendant's responses and replies thereto, **IT IS HEREBY ORDERED** that:

1.      The motion for summary judgment of plaintiff, Stilwell Value Partners I, L.P., is **DENIED**.

2.      The motion for summary judgment of defendant, Prudential Mutual Holding Co., is **GRANTED** as to question whether defendant breached its fiduciary duties to the minority shareholders by participating or acquiescing in the decision to postpone the shareholder vote on the adoption of the stock plans.  Defendant's motion for summary judgment is **DENIED** as to the question whether MHC should be enjoined from participating in the shareholder vote on the adoption of the stock plans.

_____ s/ William H. Yohn Jr. _____
William H. Yohn Jr., Judge